Steve Marquez
In Pro-Per
Steve Marquez CDCR # BI-7401
Housing 3A04 cell #129
P.O. Box 3461
Corcoran, Ca 93212

FILED
FEB 24 2020
CLERK US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                DEPUTY

# UNITED STATES DISTRICT COURT
# SOUTHER DISTRICT OF CALIFORNIA

Steve Marquez,                    ) (Amnd.) COMPLAINT
    plaintiff,                    )
                                  )
       v                          )   Civil action No:
                                  )
C. Rodriguez, Classification Official ) 18-CV-434-CAB-NLS
L. Kelly, Classification Official )
    Defendants.                   )

## I. JURISDICTION & VENUE

1) This is a civil action authorized by Bivens v. Six Unknown agents to redress the deprivation, under color of federal law, of rights secured by the Constitution of the United States. The court has jurisdiction under 28 U.S.C. Section 1331 and 1343(a)(3).

2) The Southern District of California is an appropriate venue under 28 U.S.C. Section 1391(b)(2) because it is where the events giving rise to this claim occured.

P.1

## II. PLAINTIFF

3) Plaintiff, Steve Marquez is and was at all times mentioned herein a prisoner of the state of California in the custody of Metropolitan Corections Center. He is currently confined at Corcoran State prison in Corcoran County Ca.

## III. DEFENDANTS

4) Defendant C. Rodriguez, a correctional officer at M.C.C. federal prison who, at all times mentioned in this complaint, held the rank of prison official and was assigned to M.C.C. federal prison.

5) Defendant L. Kelly, a correctional officer at M.C.C. federal prison who, at all times mentioned in this complaint, held the rank of prison official and was assigned to M.C.C. federal prison.

6) Each defendant is sued individually and in his and her official capacity. At all times mentioned in this complaint each defendant acted under color of federal law.

## IV. FACTS

7) On or about August 13, 2016, Plaintiff Steve Marquez was booked into Metropolitan Correction Center on alleged sex offense charges brought against him.

8) Due to the nature of the alleged charges brought against him, it was imperative he be placed in protective

Custody to protect him from unreasonable risk or harm or from being the subject of attack by other inmates.

9) During his interview for classification, C. Rodriguez reviewed his alleged charges and made comments towards him such as "what a great guy" and "what an upstanding citizen".

10) The official was well aware of plaintiffs charges and failed in duty to protect him from unreasonable risk or harm by refusing requests to place plaintiff into protective custody.

11) Instead he placed the plaintiff in general population and chose to ignore plaintiffs requests to be placed in protective custody and acted against prison policy and federal law. Defendant C. Rodriguez handed plaintiff an emergency contact form and said to him, "here, this is for when something happens to you in prison".

12) The plaintiff became fearful and afraid for his life and asked again to be placed in protective custody. The official ignored the plaintiff and instead advised plaintiff to lie to other inmates about his alleged charges. He said, "Don't worry about it, just tell the other inmates your here for selling drugs."

13) The classification interview then ended and the plaintiff was neglegently housed in general population where he would indeed be the subject of a life threatening attack by other inmates.

14) While housed in general population, he was distressed, worried, unable to sleep, experiencing night terrors, and lived in fear for his life.

15) Soon after being housed, he was approached by several inmates. One inmate put his hand on plaintiffs shoulder and said "we are going to break you." Another inmate said that if plaintiff does not comply with everything they said, they would take him into the restroom and "take care of him."

16) Plaintiff became afraid for his life emotionally and mentally.

17) At that point the inmates moved plaintiff to a back corner of the dormatory and the began to physically torture him by forcing him to perform extreme physical exertion until plaintiff could no longer move. Out of fear for his life and safety he complied.

18) After countless repetitions of squats they forced

plaintiff to do over 100 non stop, he began to feel dizzy, fatigue, exhausted and at that point plaintiff collapsed. All the while the other inmates constantly reminded plaintiff what would happen if he stopped and forced plaintiff to get up and continue. After plaintiffs collapse the other inmates jumped up an said "you better get back up and continue or else" So out of fear he complied. Shortly after, plaintiff collapsed a second time and they laughed at him, made fun of him and forced him to get back up and continue. Plaintiff complied and struggled to get back to his feet while experiencing unbearable pain. After more physical torture, plaintiff collapsed a third time and was completly incapasatated, plaintiff could not move or feel his legs. He experienced extreme levels of fatigue, and was in and out of conciousness, was unable to move or stand, was mentally and emotionally distraught, in extreme fear for his life and at that point the other inmates laughed at plaintiff, made insulting comments and walked away.

19) He remained in pain and in capacitated in the same location for 30 minutes until he made it back to his bunk and remained there until the next day. He began to experience more severe pain, fever, cold sweats, swelling of his face and body, vomiting, loss of apetite, urination of blood, shortness

of breath, complete loss of leg function, dizziness, headache, and mental and emotional anguish.

20) Plaintiffs condition became much worse from there so he notified an official of everything that happened and he replied, "that's crazy" and failed to move him and told him to make an appointment with medical staff to be seen. He continued to urinate blood and notified a nurse that was on routine schedule delivering medication to other inmates. He explained everything to her including his pain, symptoms and urination of blood. She scheduled him to see medical staff for later that day where they were evaluating him and drew blood for testing.

21) The next day plaintiff was called back for further blood testing and was told his condition was very serious and plaintiff was put on an emergency I.V. for a couples of hours and was then escorted back to the dorm where the incident occured.

22) For the rest of the day plaintiff continued to suffer the same symptoms and sometimes more severe episodes. He continued to urinate blood as well. Plaintiff was unable to sleep that night due to his symptoms and emotional distress and fear

P.6

23) The next day he was called back to the nurses office for more blood work and she notified him that his condition is progressively worse and put him on another I.V. for several hours.

24) Hours later plaintiff was escorted back to his dorm by an official and continued to suffer more severe symptoms and fear for his life.

25) The next day plaintiff was called back to the nurses office and was told that his condition was now beyond the capabilities of the prison medical staff and was going to be transfered by private security to the emergency room at Alvarado Hospital in San Diego Ca.

26) Plaintiff would eventually spend the next week at Alvarado Hospital where he underwent several x-rays, ultrasounds, countless needle injections for blood testing and was put on a 24 hour I.V. and endured unbearable pain and suffering as well as emotional distress and mental anguish.

27) After a day or so plaintiff spoke with a kidney specialist who explained to him that because of the physical torture, it resulted in severe kidney

failure. The doctor also explained that plaintiffs kidneys had shut down and that they could possibly never recover. He also explained that there was a possibility that plaintiff would need dialisys and that death is a realistic possibility. After the news plaintiff began to cry and asked security that escorted him to the hospital from M.C.C. if he could notify his friends and family because he could possibly die and the guard on duty told plaintiff he was under specific orders from M.C.C. not to let plaintiff contact anyone from the outside world. Plaintiffs requests to speak to his family possibly for the last time was denied and upon information and belief, plaintiff believes no efforts what so ever were made by M.C.C. to contact the victims family. This caused extreme mental and emotional anguish and pain.

28) During plaintiffs week at the hospital, as a complication to the kidney failure, he also suffered pneumonia and heart complications. Plaintiff had also lost 40 pounds since the attack. medical records are attached as Exhibit A.

29) After plaintiffs condition stabilized, the end result to his injuries included acute rhabdomyalosis,

acute renal failure, acute tubular necrosis, severe dehydration, medical renal disease, pulminary congestion, cardiomegaly, high blood pressure, severe renal azotemia, and other complications.

30) After plaintiff was discharged from the hospital, he was taken back to M.C.C where he was reinterviewed once more by L. Kelly and explained to her that he had previously been neglegently housed and as a result he was injured by other inmates. He asked her to be placed in protective custody and she chose to ignore plaintiffs requests and housed him in the same dorm on the same bunk where the attack occored.

31) Every official and medical staff personell was told by plaintiff of what had occured and was made aware of the existing and future danger he was still in and no one took action to prevent it or protect him from unreasonable risk or harm.

32) During the next few weeks plaintiff continued to see medical staff to moniter his condition. He also continued to suffer diarrhea,

unbearable stomach pain, back pain, testicle pain, leg pain, fever, night terrors, confusion, restlessness, loss of apetite, weight loss and mental and emotional distress.

33) Plaintiff remained at M.C.C for roughly another month or so until his charges were dismissed. He is now in protective custody at Corcoran State prison in Corcoran Ca.

34) In an attempt to be properly housed while at M.C.C. plaintiff notified every staff member he came in contact with including officials and medical staff to try and be moved or get help. no efforts were made on behalf of prison staff to correct the issue even after plaintiff explained to them his life threatening injuries suffered by other inmates as a direct result of C. Rodriguez's neglegent housing and L. Kelly's neglegent rehousing in the same dorm where the initial assault occured.

## V. EXHAUSTION OF LEGAL REMEDIES

35) Plaintiff filed a standard 95 claim form for damages with the appropriate division of the Bureau

of Prisons on August 14, 2017. In accordance with the applicable provisions of the statute, the agency has up to six months to make a final determination on the administrative claim for damages to which there was no relief or remedy therefore deemed denied by the Bureau of Prisons. Plaintiff has exhausted the required remedies for the (FTCA) claim. Document attached as exhibit B.)

## VI. LEGAL CLAIMS

Plaintiff realleges and incorporates by refrence paragraph 1-95

36) Defendant C. Rodriguez was deliberately indifferent to the substantial risk of serious harm or injury by placing plaintiff in general population despite being a "suspect classification" detainee and despite his requests to be placed in protective custody, and defendant knew or should have known, and disregarded a condition posing a substantial risk of serious harm or injury. As a direct result of C. Rodriguez's neglegent hasing and deliberate indifference, plaintiff suffered a life threatening physical injury, damage to vital organs, pain, suffering, mental anguish and emotional distress. This constitutes cruel and unusual punishment. Defendant C. Rodriguez's actions violated plaintiffs rights under the Eighth Amendment to the United States Constitution.

P.11

37) There was no security or administrative purpose for defendant C. Rodriguez placing plaintiff in general population and not protective custody despite his requests, and was done without reasonable basis, therefore purely arbitrary and unconstitutional. The United States has a duty to use reasonable care in insuring the safety of federal detainees no matter where they are housed. These bad conditions were significant and atypical because it resulted in plaintiffs great bodily injury. Defendant C. Rodriguez's deliberate indifference to plaintiffs neglegent housing went against prison regulation as well as federal law. Federal detainees with alleged sex offense charges are subject to a history of purposeful unequal treatment therefore found to be "suspect classification" and command extraordinary protection from the majoritarian process. The defendants actions were unlawful and unconstitutional and caused great bodily injury. The defendant denied plaintiff his Eighth amendment rights, thus violating plaintiffs rights under the Eighth Amendment to the United states Constitution.

38) Defendant L. Kelly was deliberately indifferent to the substantial risk of serious harm or injury by placing a "suspect classification" detainee in general population despite plaintiff giving her full knowledge

of life threatening and great bodily injuries suffered by plaintiff while previously in general population at M.C.C prison prior to plaintiffs hospitalization. Defendant L. Kelly knew and disregarded a previous and still existing danger that resulted in substantial harm and injury to plaintiff. Defendants actions were unlawful and unconstitutional. As a direct result of repeated neglegent housing and deliberate indifference, plaintiff suffered severe mental anguish and emotional distress which constitutes cruel and unusual punishment. Defendants actions violated plaintiffs rights under the Eighth Amendment to the United States Constitution.

39) The prison conditions that the plaintiff was placed in by defendants L. Kelly, did not have a valid security or administrative purpose. By placing plaintiff in general population and not protective custody, despite his "suspect classification" status, requests to be placed in protective custody, or knowledge given to L. Kelly of plaintiffs prior assault suffered while previously housed in general population, was done without reasonable basis, therefore purely arbitrary and unconstitutional. The United States has a duty to use reasonable care to ensure the safety of federal detainees no matter where they are housed. These bad conditions were significant and atypical because

plaintiff suffered a previous life threatening injury and informed defendant L. Kelly wich then had full knowledge of the incident. The defendants deliberate indifference by neglegently housing plaintiff went against prison regulation as well as federal law. Federal detainees that "are suspect 'Classification'" are subject to a history of porposeful and unequal treatment, therefore command extraordinary protection from the majoritarian process. The defendants actions were unlawful, unconstitutional and caused severe mental and emotional distress. The defendant denied plaintiff his Eighth Amendment Rights secured by the Eighth Amendment of the United States Constitution. The defendant violated plaintiffs Eighth amendment rights which resulted in cruel and unusual punishment.

## VII. PRAYER FOR RELIEF

40) WHEREFORE, Plaintiff respecctfully pray that this court enter judgment:

41) Granting plaintiff Marquez a declaration that the acts and omissions described herein violate his rights under the Constitution and laws of the United States, and

42) Granting plaintiff Marquez compensatory damages in the amount of $10,000,000.00 against each defendant C. Rodriguez and L. Kelly Jointly and severally.

43) Granting plaintiff Marquez punitive damages in the amount of $500,000.00 against defendants C. Rodriguez and L. Kelly jointly and severally.

44) Plaintiff also seeks a jury trial on all issues triable by jury,

45) Plaintiff also seeks recovery costs in this suit, and

46) Any additional relief this court deems just, proper and equitable.

Dated: February 10, 2020

respectfully submitted

Steve Marquez CDCR # BI-7401
Housing 3A04 cell #129
P.O. Box 3461
Corcoran, Ca 93212

# VERIFICATION

I Have read the foregoing complaint and hereby verify that the matters alleged therein are true, except as to matters alleged on information and belief, and, as to those, I believe them to be true. Persuant to 28 U.S.C section 1746, I Steve Marquez, declare under penalty of perjury that the foregoing is true and correct.

*Steve Marquez*

Dated: 2-10-20

Executed at Corcoran Ca on
feb, 10, 2020

Steve Marquez CDCR# BI-7401
Housing 3A04  cell # 129
P.O. Box 3461
Corcoran, Ca 93212

Corcoran State Prison
Steve Marquez CDCR # BI-7401
Housing 3A04 cell # 129
P.O. Box 3461
Corcoran, Ca 93212

FEB 24 2020
CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
RECEIVED

United States District Court
Southern District of California.
Office of the Clerk
333 West broadway, Suite 420
San Diego, Ca 92101

LEGAL MAIL

LM Buckley 2/2/2020