UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| STEVE MARQUEZ,<br><br>                          Plaintiff,<br><br>        vs.<br><br><br>CORRECTIONAL OFFICERS<br>RODRIGUEZ AND KELLY,<br>                          Defendants. | Case No.:  3:18-cv-0434-CAB-NLS<br><br>**ORDER GRANTING IN PART AND<br>DENYING IN PART DEFENDANTS'<br>MOTION TO DISMISS PURSUANT<br>TO Fed. R. Civ. P. 12(b)(6)**<br><br>**[Doc. No. 63]** |

Steve Marquez ("Plaintiff"), a California prisoner currently housed at Mule Creek State Prison in Ione, California, is proceeding pro se and in forma pauperis with a First Amended Complaint ("FAC") in this civil rights action filed pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  (ECF No. 49.)  Plaintiff claims his constitutional right to be free from deliberate indifference to his health and safety was violated while housed as a federal pre-trial detainee at the Metropolitan Correctional Center ("MCC") in San Diego, California, in 2016.  (FAC ¶¶ 7, 36-39.)  He alleges Defendant MCC Correctional Officer Rodriguez denied his request for protective custody upon arrival which resulted in his being threatened and tortured by other inmates causing life-threatening injuries requiring hospitalization.  (FAC ¶¶ 7-29.)  He

alleges Defendant MCC Correctional Officer Kelly denied his request for protective custody upon return from the hospital which caused further injuries from the fear of assault during the month he remained at MCC. (*Id.* ¶¶ 30-34.)

Currently before the Court is a Motion to Dismiss the FAC pursuant to Fed. R. Civ. P. 12(b)(6) by Defendants Rodriguez and Kelly. (ECF No. 63.) They contend: (1) the Court lacks subject matter jurisdiction over claims against them in their official capacities because such claims are identical to claims against the United States which have been dismissed with prejudice; (2) Plaintiff has failed to state a claim against them in their individual capacities because Plaintiff is attempting to extend *Bivens* to a new context which is precluded by *Ziglar v. Abbasi*, 582 U.S. ___, ___, 137 S.Ct. 1843, 1854 (2017); and (3) even if *Bivens* applies they are entitled to qualified immunity because Plaintiff has not alleged the denial of a clearly established federal constitutional right. (*Id.* at 15-35.) Plaintiff has filed an Opposition (ECF No. 65) to which Defendants have filed a Reply. (ECF No. 67.)

For the following reasons, the Court **GRANTS** in part the Defendants' Motion to Dismiss and **DISMISSES** the official capacity claims with prejudice. The Court **DENIES** without prejudice the Motion to Dismiss Plaintiff's individual capacity claims and **DENIES** without prejudice the Motion to Dismiss on qualified immunity. Defendants may renew these contentions on summary judgment.

## I. Plaintiff's Allegations

Plaintiff was booked into the MCC on or about August 13, 2016, "on alleged sex offense charges brought against him." (FAC ¶ 7.) He contends that due to the nature of those charges "it was imperative he be placed in protective custody to protect him from unreasonable risk of harm" from other inmates. (*Id.* ¶ 8.) When he reviewed his charges with Defendant MCC Correctional Officer Rodriguez during his initial classification interview, Plaintiff claims Rodriguez made comments like: "What a great guy," and "What an outstanding citizen." (*Id.* ¶ 9.) Plaintiff alleges Rodriguez was aware of his need for protective custody but "chose to ignore" Plaintiff's request and placed him instead in the

MCC general population "against prison policy and federal law." (*Id.* ¶ 10-11.) Rodriguez provided Plaintiff with an "emergency contact form" and said: "Here, this is for when something happens to you in prison." (*Id.* ¶ 11.) When Plaintiff "became fearful and afraid for his life and again asked to be placed in protective custody," Rodriguez replied: "Don't worry about it, just tell the other inmates your [sic] here for selling drugs." (*Id.* ¶ 12.)

"While housed in the general population, [Plaintiff] was distressed, worried, unable to sleep, experiencing night terrors, and lived in fear of his life." (*Id.* ¶ 14.) "Soon after being housed," he was approached by several inmates, one of whom placed his hand on Plaintiff's shoulder and told him: "We are going to break you." (*Id.* ¶ 15.) Another inmate told Plaintiff if he did not do as he was told, "they would take him into the restroom and 'take care of him.'" (*Id.*) Those inmates then "moved plaintiff to a back corner of the dormitory and the[y] began to physically torture him by forcing him to perform extreme physical exertion until plaintiff could no longer move." (*Id.* ¶ 17.) He complied with their demands "out of fear for his life and safety." (*Id.*) Plaintiff claims he was forced to perform over 100 squats without stopping, and constantly reminded of "what would happen if he stopped." (*Id.* ¶ 18.) He "began to feel dizzy, fatigue[d], exhausted and at that point plaintiff collapsed." (*Id.*) He resumed and collapsed a second time as the inmates laughed and made fun of him as he struggled to comply while experiencing unbearable pain. (*Id.*) When he collapsed a third time, Plaintiff claims he could no longer move and fell in and out of consciousness. (*Id.*) The other inmates walked away laughing as Plaintiff remained incapacitated for thirty minutes before returning to his bunk. (*Id.* ¶¶ 18-19.) He remained in his bunk until the next day when he "began to experience more severe pain, fever, cold sweats, swelling of his face and body, vomiting, loss of appetite, urination of blood, shortness of breath, complete loss of leg function, dizziness, headache, and mental and emotional anguish." (*Id.* at ¶ 19.)

Plaintiff alleges that when his "condition became much worse" he "notified an official of everything that happened." (*Id.* ¶ 20.) This unidentified official replied, "that's crazy," failed to move him and told him to make an appointment with medical staff. (*Id.*)

Plaintiff notified a nurse who was delivering medication of "everything," including his medical condition, and the nurse "scheduled him to see medical staff for later that day." (*Id*.) Plaintiff was evaluated and submitted to a blood draw. (*Id*.) The next day he was called back for a second blood draw, told his condition was "very serious," and was provided emergency intravenous fluids "for a couple of hours" before he was returned to the same dormitory where he was attacked. (*Id*. ¶ 21.) For the rest of that day, Plaintiff suffered "the same symptoms and sometimes more severe episodes," and continued to urinate blood. (*Id*. ¶ 22.) He was unable to sleep that night "due to his symptoms and emotional distress and fear." (*Id*.) Plaintiff was called back to the nurse's office the next day for more blood work, notified "that his condition was progressively worse," and given intravenous fluids for several hours before being returned to his dorm "to suffer more severe symptoms and fear for his life." (*Id*. ¶¶ 23-24.)

The next day Plaintiff was called back to the nurse's office, "told that his condition was beyond the capabilities of the prison medical staff," and transferred to the emergency room at Alvarado Hospital. (*Id*. ¶ 25.) He stayed there for a week "where he underwent several x-rays, ultrasounds, countless needle injections for blood testing and was put on a 24 hour I.V." (*Id*. ¶ 26.) Plaintiff claims he "endured unbearable pain and suffering as well as emotional distress and mental anguish." (*Id*.) After he had been at the hospital "for a day or so," a kidney specialist told him he had "severe kidney failure," that his "kidneys had shut down and that they could possibly never recover," that he may need dialysis, "and that death [was] a realistic possibility." (*Id*. ¶ 27.) Plaintiff asked the security guard who escorted him from MCC if he could contact his family and friends to let them know he might die but was told MCC had issued orders "not to let plaintiff contact anyone from the outside world." (*Id*.) He suffered pneumonia and heart complications related to his kidney failure and lost 40 pounds. (*Id*. ¶ 28.) "[T]he end result [of] his injuries included acute [rhabdomyolysis], acute renal failure, acute tubular necrosis, severe dehydration, medical renal disease, pulmonary congestion, cardiomegaly, high blood pressure, severe renal azotemia, and other complications." (*Id*. ¶ 29.)

Once discharged from Alvarado Hospital and returned to MCC, Plaintiff was interviewed by Defendant MCC Correctional Officer Kelly. (*Id*. ¶ 30.) He explained to Defendant Kelly what had previously occurred and again requested protective custody. (*Id*.) Kelly "chose to ignore" the request and housed him in the same dormitory and same bunk as before. (*Id*.) Plaintiff continued to see medical staff to monitor his condition and "continued to suffer diarrhea, unbearable stomach pain, back pain, testicle pain, leg pain, fever, night terrors, confusion, restlessness, loss of ap[p]etite, weight loss and mental and emotional distress." (*Id*. ¶ 32.) He remained at MCC "for roughly another month or so until his charges were dismissed," and states that he was in protective custody at Corcoran State Prison at the time of filing the FAC. (*Id*. ¶ 33.) Plaintiff alleges that although he "notified every staff member he came in contact with" at MCC about his vulnerabilities and need to be rehoused, "no efforts were made" to address the issues. (*Id*. ¶ 34.)

Plaintiff claims Defendants Rogriguez and Kelly were "deliberately indifferent to the substantial risk of serious harm or injury" when they ignored his requests for protective custody and placed him in the general population at MCC despite knowledge of his "suspect classification," that they knew or should have known of that risk but disregarded it, and that he was injured as a result. (*Id*. ¶¶ 6, 36-39.) He sues Defendants Rogriguez and Kelly in their official and individual capacities, and seeks a declaration of his rights, compensatory and punitive damages, costs and a jury trial. (*Id*. ¶¶ 40-46.)

## II. Defendants' Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b)(6)

### A. Standard of Review

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). The Court accepts as true the facts as alleged in the operative complaint on a motion to dismiss. *Shah v. County of Los Angeles*, 797 F.2d 743, 745 (9th Cir. 1986).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.,* citing *Twombly*, 550 U.S. at 556.

"As a general rule, a district court may not consider any material beyond the pleadings in the ruling on a Rule 12(b)(6) motion." *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) (quote marks omitted); *see* Fed.R.Civ.P. 12(d) ("If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion.") Although "a court may [ordinarily] look only at the face of the complaint to decide a motion to dismiss," it may consider documents referenced in the complaint which are "accepted by all parties as authentic" without converting a Rule 12(b)(6) motion into one for summary judgment. *Van Buskirk v. Cable News Network, Inc.*, 284 F.3d 977, 980 (9th Cir. 2002).

## B.    Official Capacity Claims

Defendants first move to dismiss the claims brought against them in their official capacities, arguing this Court lacks jurisdiction over such claims. (Defs.' Memo of P&As in Supp. of Mot. to Dismiss [hereinafter "Defs.' MTD"] at 4 [ECF No. 63 at 15]), citing *Consejo de Desarrollo Economico de Mexicali, A.C. v. United States*, 482 F.3d 1157 (9th Cir. 2007).) *Consejo* holds that a district court lacks jurisdiction over a *Bivens* action against an individual defendant in his or her official capacity because it "would merely be another way of pleading an action against the United States, which [is] barred by the doctrine of sovereign immunity." 482 F.3d at 1173. Defendants are correct that "a *Bivens* action can be maintained against a defendant in his or her individual capacity only, and not in his or her official capacity." *Daly-Murphy v. Winston*, 837 F.2d 348, 355 (9th Cir. 1987); *see also Consejo*, 482 F.3d at 1173 ("[D]istrict court lacked subject matter jurisdiction over the [official capacity] claim because the United States has not consented to its officials being sued in their official capacities.")

The Court has already dismissed the United States as a Defendant in this action with prejudice on a prior motion to dismiss. (ECF No. 38.) Therefore, the Court **GRANTS** Defendants' Motion to Dismiss all claims brought against Rodriguez and Kelly in their official capacities for lack of subject matter jurisdiction and **DISMISSES** those claims with prejudice.

## C. Individual Capacity Claims

Defendants move to dismiss the claims against them in their individual capacities for failure to state a *Bivens* claim because: (1) the "implied cause of action" in a *Bivens* suit has never been expanded to cover a Fifth Amendment due process claim for deliberate indifference to a federal pre-trial detainee's safety, and (2) such an expansion is precluded by *Abbasi*. (Defs.' MTD at 4-19 [ECF No. 63 at 15-30].)

The Supreme Court has held that the determination whether to allow a *Bivens* action to proceed requires application of a two-part test. The first inquiry asks whether the action "arises in a 'new context' or involves 'a new category of defendants.'" *Hernandez v. Mesa*, 589 U.S. ___, ___, 140 S.Ct. 735, 743 (2020), quoting *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 70 (2001). "If the case is different in a meaningful way from [the three] previous *Bivens* cases decided by this Court, then the context is new." *Abbasi*, 137 S.Ct. at 1859. Those three cases include "a claim against FBI agents for handcuffing a man in his own home without a warrant; a claim against a Congressman for firing his female secretary; and a claim against prison officials for failure to treat an inmate's asthma." *Id*. at 1860, referring respectively to *Bivens*, *Davis v. Passman*, 442 U.S. 228 (1979) and *Carlson v. Green*, 446 U.S. 14 (1980).

If there are meaningful differences, "a *Bivens* remedy will not be available if there are '"special factors counseling hesitation [to extend *Bivens*] in the absence of affirmative action by Congress."'" *Id*. at 1857, quoting *Carlson*, 446 U.S. at 18, quoting *Bivens*, 403 U.S. at 396. The special factors inquiry "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Id*. at 1857-58. "[S]eparation of powers

7

principles are or should be central to the analysis," and when "[t]he question is 'who should decide' whether to provide for a damages remedy, Congress or the courts? [¶] The answer most often will be Congress." *Id.* at 1857, quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983). In order "to be a 'special factor counselling hesitation,' a factor must cause a court to hesitate" to extend *Bivens*. *Id.* at 1858.

### 1. Plaintiff's claim arises in a new *Bivens* context

The Court first notes that although the FAC alleges a violation of the Eighth Amendment's protection from deliberate indifference to Plaintiff's health and safety by two MCC guards, Plaintiff's claim arises under the Due Process Clause of the Fifth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 n.16 (1979) (noting that "the Due Process Clause [of the Fifth Amendment] rather than the Eighth Amendment" is applicable to claims of pre-trial detainees because "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.") The Court liberally construes the FAC as alleging a violation of the Fifth Amendment. *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1261 (9th Cir. 1992) (noting that the rule of liberal construction is "particularly important in civil rights cases.") Thus, the first *Abbasi* question asks whether a claim arising under the Due Process Clause of the Fifth Amendment for failure to protect a federal pre-trial detainee differs in a meaningful way from any of the three previous *Bivens* case decided by the Supreme Court. *Abbasi*, 137 S.Ct. at 1854. The *Abbasi* Court stated:

> Without endeavoring to create an exhaustive list of differences that are meaningful enough to make a given context a new one, some examples might prove instructive. A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

*Id.* at 1859-60.

As pertinent here, *Abbasi* found that a Fifth Amendment claim against a warden for allowing guards to abuse immigration detainees arose in a new *Bivens* context. *Abbasi*, 137 S.Ct. at 1864. The Court reasoned that although the claim "has significant parallels to one of the Court's previous *Bivens* cases, *Carlson* . . . [w]here the Court did allow a *Bivens* claim for prisoner mistreatment - specifically, for failure to provide medical care," it would be a modest extension of *Carlson*'s Eighth Amendment failure to provide convicted prisoners with adequate medical care to apply *Bivens* to a Fifth Amendment due process claim for mistreatment of immigration detainees, noting that "even a modest extension is still an extension." *Id.*

Of the three Supreme Court *Bivens* cases listed by *Abbasi*, *Carlson* is the closest fit here. In *Carlson* the Court held that a *Bivens* damages remedy is available under the Cruel and Unusual Punishments Clause of the Eighth Amendment to the estate of a federal prisoner who died due to the failure of federal correctional officers to provide adequate medical care. *Carlson*, 446 U.S. at 16-18. Plaintiff here seeks to hold federal correctional officers liable under the Due Process Clause of the Fifth Amendment for failure to protect a federal pre-trial detainee from assault by other inmates based on his arrest offense. The category of defendants is the same here as *Carlson*, federal correctional officers, but the constitutional right at issue, cruel and unusual punishment under the Eighth Amendment in *Carlson* and due process under the Fifth Amendment here, are different. *See Kingsley v. Hendrickson*, 576 U.S. 389, 400 (2015) ("The language of the [Due Process Clause protecting pre-trial detainees and the Cruel and Unusual Punishments Clause protecting prisoners] differs, and the nature of the claims often differs.") In particular, a subjective test applies as to whether a federal correctional officer violates a prisoner's Eighth Amendment right to be free from cruel and unusual punishment. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994) (assuming *Bivens* applies to an Eighth Amendment failure to protect claim by a federal prisoner and holding that a prison official can be held liable only if "the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a

substantial risk of serious harm exists, and he must also draw the inference.")  In contrast, Defendants correctly observe that assuming *Bivens* applies here Plaintiff's claim would be addressed under the objective standard of a Fourteenth Amendment due process claim. (Defs.' MTD at 21-22 [ECF No. 32-33].)  Under that standard, "a pretrial detainee who asserts a due process claim for failure to protect [is required] to prove more than negligence but less than subjective intent - something akin to reckless disregard." *Castro v. County of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016).  For the purpose of this motion to dismiss, the Court will assume the test for a Fifth Amendment Due Process Clause claim for failure to protect a federal pre-trial detainee is identical to the Fourteenth Amendment objective test.  *See Kingsley*, 576 U.S. at 396-97 (holding that a pretrial detainee bringing an excessive force claim "must show only that the force purposely or knowingly used against him was objectively unreasonable."); *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."); *see also Malinski v. New York*, 324 U.S. 401, 415 (1945) (Frankfurter, J., concurring) ("To suppose that 'due process of law' meant one thing in the Fifth Amendment and another in the Fourteenth is too frivolous to require elaborate rejection.")

The Ninth Circuit has yet to determine whether allowing a *Bivens* damages remedy to a Fifth Amendment due process claim by a federal pre-trial detainee for failure to protect would extend *Bivens* to a new context.  That Court has, however, applied the *Abbasi* new context test to other claims, consistently finding *Bivens* would be extended to new contexts. In the only published opinion which the Ninth Circuit has found a damages remedy would not be an extension of *Bivens*, *Ioane v. Hodges*, 939 F.3d 945 (9th Cir. 2018), the Court found that a Fourth Amendment claim alleging a warrantless search of a person in violation of her right to bodily privacy was sufficiently like the *Bivens'* Fourth Amendment claim to be free from unreasonable searches and seizures in a home.  *Id*. at 952.  The Court found the extent of judicial guidance as to how the officer should have responded was well established and found no differences between the two cases with respect to the rank of the

officers involved, the generality of the official action or the legal mandate under which the officers were operating. *Id*. The only other Ninth Circuit case to find a claim was not seeking to extend *Bivens* is *Reid v. United States*, 825 Fed.Appx. 442 (9th Cir. Sept. 2, 2020) (unpublished), in which the Court found that a federal prisoner's Eighth Amendment claim for retaliatory excessive use of force was not an extension of *Bivens* in light of *Carlson*'s recognition of a *Bivens* remedy for an Eighth Amendment claim for deliberate indifference to medical care. *Id*. at 444. The Court reasoned that such a claim "will not require courts to plow new ground because there is extensive case law establishing conditions of confinement claims and the standard for circumstances that constitute cruel and unusual punishment." *Id*. at 444-45.

The remaining Ninth Circuit cases which have applied the *Abbasi* new context test have found, with one exception, that *Bivens* would be extended to new contexts. Most recently, in *Boule v. Egbert*, 998 F.3d 370 (9th Cir. 2021), the Court found a Fourth Amendment excessive force claim was a "modest extension" of *Bivens* because the two cases involved federal law enforcement officials from different agencies, even though *Bivens* also involved a Fourth Amendment claim and despite the fact that Boule's claim was "indistinguishable from Fourth Amendment excessive force claims that are routinely brought under *Bivens* against F.B.I. agents." *Id*. at 387. The Court also found Boule's First Amendment retaliation claim sought to extend *Bivens* to a new context despite language in *Hartman v. Moore*, 547 U.S. 250, 256 (2006) which "explicitly stated, as part of its reasoning during the course of a *Bivens* analysis, that such a claim may be brought," and despite the fact that "[i]t has long been the law that federal officials violate the First Amendment when they retaliate for protected speech," because the Supreme Court stated in *Reichle v. Howards*, 566 U.S. 658, 663 n.4 (2012) that it has "never actually *held* that a First Amendment retaliation claim may be brought under *Bivens*." *Id*. at 389-90.

In *Lanuza v. Love*, 899 F.3d 1019 (9th Cir. 2018) an immigration detainee brought a Fifth Amendment claim alleging a federal immigration prosecutor forged a document to prevent adjustment to lawful permanent residence status. *Id*. at 1027-28. The Ninth Circuit

found the claim arose in a new *Bivens* context because "[w]e know of no other case that has discussed a *Bivens* remedy in this context." *Id*. The *Lanuza* opinion cited *Vega v. United States*, 881 F.3d 1146, 1147-48 (9th Cir. 2018), which declined to extend *Bivens* to an action by a former federal prisoner alleging violations of the First and Fifth Amendments against private employees of a residential reentry program. *Id*. at n.5. The only other published Ninth Circuit case is *Rodriguez v. Swartz*, 899 F.3d 719 (9th Cir. 2018), *vacated by* 140 S.Ct. 1258 (2020), in which the Court found a cross-border shooting claim would require extending *Bivens* to a new context. *Id*. at 738. *Lanuza* also cited *Brunoehler v. Tarwater*, 743 Fed.Appx. 740, 742 (9th Cir. 2018) (unpublished) (unlawful wiretapping claim would be an extension of *Bivens* but typical search and seizure claim would not), and *Zavala v. Rios*, 721 Fed.App'x. 720, 721 (9th Cir. 2018) (unpublished) (applying *Bivens* to claim challenging prison policy regarding handling of unopened mail would be an extension). Additional cases after *Lanuza* which have found claims would extend *Bivens* to a new context include *Martinez v. United States Bureau of Prisons*, 830 Fed.Appx. 234, 235 (9th Cir. 2020) (unpublished) (Eighth Amendment claim alleging inadequate exercise); *Hobbs v. Devine*, 819 Fed.Appx. 543, 544 (9th Cir. 2020) (unpublished) (Fourth and Fourteenth Amendment claims against FBI agent for conduct in a foreign country); *Smith-Garcia v. Burke*, 815 Fed.Appx. 187, 188 (9th Cir. 2020) (unpublished) (Eighth Amendment claim that probation officer was deliberately indifferent to a probationer's medical care); *Luis Buenrostro v. Fajardo*, 770 Fed.Appx. 807, 808 (9th Cir. 2019) (unpublished) (First Amendment prisoner retaliation claim); and *Schwarz v. Meinberg*, 761 Fed.Appx 732, 734 (9th Cir. 2019) (unpublished) (Eighth Amendment claim for unsanitary cell conditions, First Amendment access to courts claim, and Fifth Amendment due process claim for national origin discrimination by federal prisoner).

Based on the foregoing Ninth Circuit authority, the Court finds that Plaintiff's Fifth Amendment failure to protect claim would extend *Bivens* to a new context within the meaning of *Abbasi*. Only in *Ioane* and *Brunoehler*, which involved Fourth Amendment claims indistinguishable from *Bivens* itself, and in *Reid*, which involved similar Eighth

Amendment prisoner mistreatment claims as *Carlson*, has the Ninth Circuit recognized sufficiently similar situations to sustain a *Bivens* cause of action after *Abbasi*. While *Reid* is perhaps the closest fit to the instant case in that it finds no meaningful difference between the deliberate indifference standard applicable to different types of Eighth Amendment prisoner abuse claims, there is a meaningful difference between the subjective standards of the Cruel and Unusual Punishment Clause claim at issue in *Carlson* and *Reid* and the objective standards applicable to the Due Process Clause claim at issue here. *See Kingsley*, 576 U.S. at 400 ("The language of the two clauses differs, and the nature of the claims often differs."); *see also Abbasi*, 137 S.Ct. 1865 ("The differences between [the detainee mistreatment claim here] and the one in *Carlson* are perhaps small, at least in practical terms. Given this Court's expressed caution about extending the *Bivens* remedy, however, the new-context inquiry is easily satisfied.")

The Court reaches this conclusion despite the Third Circuit's decision in *Bistrian v. Levi*, 912 F.3d 79 (3rd Cir. 2018). In *Bistrian*, the Court held that a failure to protect claim by a federal pre-trial detainee alleging retaliatory assault by other inmates did not extend *Bivens* to a new context. *Id.* at 91. That Court relied on a case the *Abbasi* majority did not cite or reference, *Farmer v. Brennan*, 511 U.S. 825 (1994), which clarified the Eighth Amendment deliberate indifference standard in a case involving a failure to protect claim by a transsexual federal prisoner beaten and raped in the general population. *Id.* at 830; see *Bistrian*, 912 F.3d at 91 (finding that "*Farmer* practically dictates our ruling today because it is a given that the Fifth Amendment provides the same, if not more, protection for pretrial detainees than the Eighth Amendment does for imprisoned convicts."); *but see Abbasi*, 137 S.Ct. at 1855 ("These three cases - *Bivens*, *Davis*, and *Carlson* - represent the *only* instances in which the Court has approved of an implied damages remedy under the Constitution itself.") (emphasis added). *Bistrian* is not binding authority, and district courts in the Ninth Circuit have disagreed with its holding. *See e.g., Carey v. Von Blanckensee*, __F.Supp.3d__, 2021 WL 672563, at *4 (D. Ariz. Jan. 27, 2021) ("Although the Supreme Court may have *assumed* for analytical purposes that a *Bivens* cause of action exists under

the Eighth Amendment for failing to protect an inmate, *see Farmer v. Brennan*, 511 U.S. 825 (1994), it has never specifically *concluded* that such a cause of action exists."); *Hoffman v. Preston*, 16cv1617-LJO-SAB (PC), 2020 WL 58039, at *2 (E.D. Cal. Jan. 6, 2020) (noting that "the U.S. Supreme Court never explicitly stated in *Farmer* that it was recognizing an implied *Bivens* Eighth Amendment failure to protect claim."), *appeal filed*, No. 20-15396 (9th Cir. Mar. 9, 2020); *see also Toney v. William*s, No. 18cv2786-WQH (KSC), 2020 WL 1912168, at *5-6 (S.D. Cal. Apr. 4, 2020) (finding *Bivens* claim by federal pre-trial detainee housed at MCC alleging a Fifth Amendment due process violation from denial of administrative grievance challenging MCC medical policy was a modest extension of *Carlson*).  Although several district courts in the Ninth Circuit have found that a *Bivens* failure to protect claim survived *Abbasi*, s*ee e.g. Smith v. Shartle*, 18cv0323-TUC-RCC, 2021 WL 842144, at *8 (D. Ariz. Mar. 5, 2021) (collecting cases), *appeal filed*, No. 2115834 (9th Cir. May 10, 2021), those cases were decided prior to *Boule*, the Ninth Circuit's most recent opinion on the proper application of the *Abbasi* test.[1]

Accordingly, in the absence of Ninth Circuit authority directly on point, the Court concludes that recognition of a damages remedy here would be at least a modest extension of *Bivens* to a new context because a federal pre-trial detainee's failure to protect claim is different in a meaningful way from the Eighth Amendment claim presumed viable in *Farmer*, the Eighth Amendment claim in *Carlson*, the Fourth Amendment prohibition against unreasonable searches and seizures at issue in *Bivens*, and the Fifth Amendment's protection for gender discrimination recognized by *Davis*.  Plaintiff's claim here, a Fifth

---

[1] Among the collection of cases in *Smith* is the initial screening order in this case where the Court found Plaintiff's allegations "sufficient to survive the low threshold for proceeding past the sua sponte screening required by 28 U.S.C. §§ 1915(e)(2) and 1915(A)."  *Marquez v. United States*, 18cv0434-CAB (NLS), 2018 WL 1942418, at *4 (S.D. Cal. Apr. 25, 2018); *but see Teahan v. Wilhelm*, 481 F.Supp.2d 1115, 1119 (S.D. Cal. 2007) (noting that the sua sponte screening process is "cumulative of, not a substitute for, any subsequent Rule 12(b)(6) motion that the defendant may choose to bring.")

Amendment claim alleging deliberate indifference to a risk of physical assault in the general population of a pre-trial detention facility based on the nature of the detainee's arrest offense, arises in a different context. Among the list of meaningful differences identified in *Abbasi* are the constitutional right at issue, the extent of judicial guidance as to how the officer should respond, and the legal mandate under which the officer operated. *Abbasi*, 137 S.Ct. at 1859-60. In addition to the differences between failure to protect a prisoner based on sexual characteristics in *Farmer* and the claims here, all three of those considerations are implicated by the difference in the objective and subjective standards applicable to Fifth and Eighth Amendment claims. *See Abbasi*, 137 S.Ct. 1865 ("The differences between this [inmate abuse] claim and the one in *Carlson* are perhaps small, at least in practical terms. Given this Court's expressed caution about extending the *Bivens* remedy, however, the new-context inquiry is easily satisfied.") In any case, the Supreme Court in *Farmer* did not have the occasion to hold that *Bivens* applied to prisoner failure to protect claims but merely assumed it did, and it did so nearly twenty years before *Abbasi* was decided. *See id.* at 1856 (observing that "in light of the changes to the Court's general approach to recognizing implied damages remedies, it is possible that the analysis in the Court's three *Bivens* cases might have been different if they were decided today.") The fact that the Supreme Court has never actually recognized that *Bivens* applies in a failure to protect a pre-trial detainee context supports a finding under *Abbasi* and recent Ninth Circuit authority that Plaintiff is seeking to extend *Bivens* to a new context. *See Boule*, 998 F.3d at 389-90. Even assuming the constitutional right in *Carlson* and *Farmer* can be described at a very general level and considered the same right at issue here, a right to be free from abuse while in federal custody, the Supreme Court has never extended *Bivens* to a pre-trial detainee's failure to protect claim. *See Abbasi*, 137 S.Ct. at 1855 ("These three cases - *Bivens*, *Davis*, and *Carlson* - represent the *only* instances in which the Court has approved of an implied damages remedy under the Constitution itself.")

The Court finds it would be a modest extension of the *Bivens* damages remedy to a new context to recognize a *Bivens* action for Plaintiff's Fifth Amendment pre-trial detainee

failure to protect due process claim. Therefore, the Court must next consider whether special factors prevent an extension of *Bivens* under the circumstances presented here. *Abbasi*, 137 S.Ct. at 1857.

### 2. Dismissal is not appropriate for failure to state a *Bivens* claim

Defendants argue that special factors exist which prevent an extension of *Bivens* to Plaintiff's failure to protect claim. (Defs.' MTD at 13-19 [ECF No. 63 at 24-30].) They identify those special factors as: (1) the fact that Congress has extensively legislated on prison issues but has not authorized a damages remedy for the type of claim brought by Plaintiff, (2) the potential burden on MCC and its individual employees in performing the important task of running a prison, (3) the presence of an alternative remedial structure available to Plaintiff, including the Federal Bureau of Prisons ("BOP") Administrative Remedy Program grievance process, a suit for declaratory and injunctive relief pursuant to 18 U.S.C. § 3626, and possibly a writ of habeas corpus, and (4) the "serious difficulty of devising a workable cause of action." (*Id.*)

The special factor determination "must concentrate on whether the Judiciary is well suited, absent congressional action or instruction, to consider and weigh the costs and benefits of allowing a damages action to proceed." *Abbasi*, 137 S.Ct. at 1857-58. In order "to be a 'special factor counselling hesitation [to extend *Bivens*],' a factor must cause a court to hesitate before answering that question in the affirmative." *Id.* at 1858. "[S]eparation of powers principles are or should be central to the analysis," and when "[t]he question is 'who should decide' whether to provide for a damages remedy, Congress or the courts? [¶] The answer most often will be Congress." *Id.* at 1857, quoting *Bush v. Lucas*, 462 U.S. 367, 380 (1983). *Abbasi* observed "that it has consistently refused to extend *Bivens* to any new context or new category of defendants" in the 30 years since it last did so in *Carlson*, and that "expanding the *Bivens* remedy is now a disfavored judicial activity." *Id.* at 1857 (internal quote marks omitted).

The detainees in *Abbasi* brought claims challenging detention policies and a claim alleging abuse by guards. *Id.* at 1853-54. Special factors counseled against extending

*Bivens* to the detention policy claims because: (1) "a *Bivens* action is not a 'proper vehicle for altering an entity's policy,'" as it is designed to seek damages against individual officers, (2) "[n]ational security policy is the prerogative of the Congress and President," and no damages remedy had been enacted by Congress despite "frequent and intense" Congressional interest regarding the types of detainees in *Abbasi* and their conditions of confinement, and (3) "[un]like *Bivens* or *Davis* in which 'it is damages or nothing,'" there were "faster and more direct route[s] to relief than a suit for money damages" for the claims challenging the detention policies, including actions for injunctive relief and potentially habeas corpus. *Id*. at 1860-63. Before applying the special factors test to the detainee abuse claim, which is most analogous to the claim here and which the warden (like Defendants here) sought to dismiss under *Iqbal* for failing to state a plausible *Bivens* claim for relief, *Abbasi* noted that "the existence of alternate remedies usually precludes a court from authorizing a *Bivens* action." *Id*. at 1865. It suggested such remedies might include a writ of habeas corpus or some form of injunctive or equitable relief, and stated:

> Some 15 years after *Carlson* was decided, Congress passed the Prison Litigation Reform Act of 1995, providing comprehensive changes to the way prisoner abuse claims must be brought in federal court. See 42 U.S.C. § 1997e. So it seems Congress had specific occasion to consider the matter of prisoner abuse and to consider the proper way to remedy those wrongs. This Court has said in dicta that the Act's exhaustion provisions would apply to *Bivens* suits. See *Porter v. Nussle*, 534 U.S. 516, 524 (2002). But the Act itself does not provide for a standalone damages remedy against federal jailers. It could be argued that this suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment.

*Id*.

Finding the record had not been sufficiently developed on a motion to dismiss with respect to whether *Bivens* should be extended to the detainee abuse claim, the *Abbasi* Court remanded with instructions for either the district or appellate court "to perform the special factors analysis itself." *Id*. For the following reasons, this Court also finds the record is insufficiently developed at this stage of the case, a motion to dismiss, to determine whether special factors exist to prevent an extension of *Bivens* to Plaintiff's claim.

### i) Congressional silence when legislating in prison context

The first special factor identified by Defendants is the fact that Congress has extensively legislated on prison issues but has not authorized a damages remedy for the type of claim brought by Plaintiff. (Defs.' MTD at 13-15 [ECF No. 63 at 24-26].) Defendants argue Congress has legislated with respect to federal prisoners, including their placement, security designation, programming, mental and medical health care and faith-based concerns, and has limited judicial scrutiny of security classifications for prisoners under the Americans With Disabilities Act, all without creating a separate statutory damages remedy. (*Id.*, citing 18 U.S.C. §§ 3621(b) & 3625.) The Court in *Abbasi* stated "it could be argued that" the decision by Congress not to include a standalone damages remedy in the "comprehensive changes to the way prison abuse claims must be brought in federal court" through passage of the Prison Litigation Reform Act ("PLRA"), "suggests Congress chose not to extend the *Carlson* damages remedy to cases involving other types of prisoner mistreatment." *Abbasi*, 137 S.Ct. at 1865; *see e.g. Hernandez*, 140 S.Ct. at 752 (Thomas, J., concurring) (noting that the Federal Torts Claims Act and 42 U.S.C. § 1983 show that "Congress has demonstrated that it knows how to create a cause of action to recover damages for constitutional violations when it wishes to do so.")

However, Congress is presumed to legislate with knowledge of Supreme Court decisions. *Lorillard v. Pons*, 434 U.S. 575, 580-81 (1978). The PLRA did not eliminate or repudiate the judicially created damages causes of action in *Bivens*, or that remedy as it was extended to federal prisoners in *Carlson*, which the Court in *Farmer* assumed also applied to failure to protect claims. *See e.g. Bivens*, 403 U.S. at 397 ("[W]e have here no explicit congressional declaration that persons injured by a federal officer's violation of the Fourth Amendment may not recover money damages from the agents, but must instead be remitted to another remedy, equally effective in the view of Congress.") In fact, one provision of the PLRA allows federal pre-trial detainee actions to proceed after an attempt to resolve them prior to litigation through exhaustion of prison administrative procedures. *See* 42 U.S.C. § 1997e(a) ("No action shall be brought with respect to prison conditions

under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."); *id*. § 1997e(h) (defining "prisoner" to include "any person incarcerated or detained in any facility who is accused of . . . violations of criminal law . . . ."); *see also Abbasi*, 137 S.Ct. at 1865 (noting that the Court has said in dicta that the exhaustion provisions of the PLRA apply in *Bivens* suits).

*Abbasi* did not find this factor categorically counseled in favor of hesitating to expand *Bivens*, although it could have, but remanded for it to be considered along with other factors. The Court will likewise consider this factor in conjunction with the next factor.

### ii) Burden on BOP and its employees in running a prison

Defendants argue that recognizing a damages remedy here could burden the BOP and its individual employees in performing the important task of running a prison. (Defs.' MTD at 13-15, 17-18 [ECF No. 63 at 24-26, 28-29].) Defendants point out that the Supreme Court has cautioned federal courts against interfering with prison operations beyond the extent of specific statutes passed by Congress. *See Bell*, 441 U.S. at 562 (noting that courts have "become increasingly enmeshed in the minutiae of prison operations" and "the inquiry of federal courts into prison management must be limited to the issue of whether a particular system violates any prohibition of the Constitution or, in the case of a federal prison, a statute."); *Sandin v. Conner*, 515 U.S. 472, 483 (1995) (noting that the Supreme Court has often stated that courts must "afford appropriate deference and flexibility to [prison] officials trying to manage a volatile environment.") (collecting cases).

Plaintiff here alleges the refusal to place him in protective custody "went against prison regulation as well as federal law," and "[t]here was no security or administrative purpose for" refusing to place him in protective custody. (FAC ¶¶ 37-39.) Defendants have not identified any federal laws or prison regulations in place at MCC which would contradict the plausible inference from Plaintiff's allegations, which Defendants acknowledge must be taken as true for the purpose of their motion to dismiss (Defs.' MTD

at 2, n.1 [ECF No. 63 at 13 n.1]), that prison regulations were in place at MCC providing for, or even requiring, protective custody. *See e.g.* 28 C.F.R. § 522.21(a)(1) (directing that BOP staff shall conduct inmate interviews upon arrival "to determine . . . non-medical reasons for housing the inmate away from the general population."); 28 C.F.R. § 541.21 (establishing BOP Special Housing Units to "ensure the safety, security, and orderly operation" of the facility). The record has not been developed regarding whether and to what extent those regulations have been implemented at MCC, what if any effect recognizing a *Bivens* claim arising from the failure to place Plaintiff in protective custody would disrupt operations at MCC, and most importantly whether Plaintiff is challenging MCC policy or merely the actions by the individual correctional officers. *See Abbasi*, 137 S.Ct. at 1860 (holding that the purpose of *Bivens* is not advanced by challenges to detention policies); *Correctional Services Corp. v. Malesko*, 534 U.S. 61, 70 (2001) ("The purpose of *Bivens* is to deter individual federal officers from committing *constitutional* violations.") (emphasis added).

Given the distinction the Supreme Court has made with respect to challenges to detention policies which do not lend themselves to damages remedies under *Bivens* and acts by individual federal officers which do, with respect to both congressional silence and the burdens imposed on the BOP to protect pre-trial detainees from harm at the hands of fellow inmates, the Court finds it is premature on the record before the Court at this time to determine whether such factors necessarily preclude extending *Bivens* relief in this case. *See Navarro*, 250 F.3d at 732 ("A Rule 12(b)(6) tests the legal sufficiency of a claim."); *Iqbal*, 556 U.S. at 678 ("To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.") (internal quote marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. This is consistent with *Abbasi*, which did not rely on these factors in the abstract but remanded for record development. As discussed below, such development is more appropriate on summary judgment than a motion to dismiss.

### iii) **Alternative remedial structures**

The next special factor, which *Abbasi* noted is related to those just discussed and potentially dispositive, provides: "If there is an alternative remedial structure present in a certain case, that alone may limit the power of the Judiciary to infer a new *Bivens* cause of action." *Abbasi*, 137 S.Ct. at 1858. Defendants argue alternate available remedies exist in the form of prison administrative grievance procedures and an action for declaratory and injunctive relief under 18 U.S.C. § 3626. (Defs.' MTD at 16-17 [ECF No. 63 at 27-28].) They also note it is an open question whether Plaintiff could obtain relief through a federal writ of habeas corpus. (*Id*. at 17, n.12 [ECF No. 63 at 28, n.12], citing *Abbasi*, 137 S.Ct. at 1863-64, citing *Bell*, 441 U.S. at 526 n.6 ("[W]e leave to another day the question of the propriety of using a writ of habeas corpus to obtain review of the conditions of confinement, as distinct from the fact or length of the confinement itself.") and *Preiser v. Rodriguez*, 411 U.S. 475, 499 (1979) ("When a prisoner is under additional and unconstitutional restraints during his lawful custody, it is arguable that habeas corpus will lie to remove the restraints making custody illegal.")); *see also Nettles v. Grounds*, 830 F.3d 922, 931 (9th Cir. 2016) (en banc) (holding that claims by state prisoners which challenge conditions of confinement but not the fact or duration of confinement must proceed under 42 U.S.C. § 1983 and not on habeas, but declining to address whether that applies to federal prisoners); *id*. at 931 n.6 ("As a further distinction, § 1983 is generally unavailable to federal prisoners challenging prison conditions, but such prisoners may have recourse under *Bivens* and the Federal Tort Claims Act.")[2]

In support of their contention that alternative remedial structures exist in the form of prison administrative remedies which preclude a *Bivens* claim for relief, Defendants cite to *Vega*, where the Court declined to extend *Bivens* to First and Fifth Amendment due process

---

[2]  The Ninth Circuit has noted that the existence of a Federal Torts Claims Act claim is not an available alternative remedy in a case like this because it does not apply to individual federal actors.  *Boule*, 998 F.3d at 391-92.

and access to courts claims by a former federal prisoner against private employees of a residential reentry program. The defendants in *Vega* allegedly removed plaintiff from the program based on his race and in retaliation for filing administrative grievances. *Vega*, 881 F.3d at 1147-53. The *Vega* Court found adequate alternative remedies were available to address the retaliation and due process complaints through the Administrative Remedy Program, in particular 28 C.F.R. § 542.10(a), which Vega did not utilize and which could have provided review of the residential reentry program's policies, and 28 C.F.R. § 541.7(e), which he did utilize to review the allegedly false incident report giving rise to his claims and which provided relief in the form of his return to the residential reentry center. *Id*. at 1154-55. Vega also found that the state law claims plaintiff presented, which although they ultimately failed due to pleading deficiencies, did not preclude their use as a special factor because "no court has held that the plaintiff's lack of success due to inadequate pleading while pursuing alternative remedies provides a basis for *Bivens* relief." *Id*. The Ninth Circuit has also found in an unpublished opinion that special factors counsel against extending *Bivens* to a federal prisoner's First Amendment retaliation claim because "an alternative remedial structure exists . . . through the Bureau of Prisons administrative grievance process" to address the plaintiff's harassment claims. *Luis Buenrostro*, 770 Fed.Appx. at 808. That court cited *Malesko*, 534 U.S. at 69 (noting that the Supreme Court has "rejected the claim that a *Bivens* remedy should be implied simply for want of any other means for challenging a constitutional deprivation in federal court."), *United States v. Stanley*, 483 U.S. 669, 683 (1987) ("The 'special facto(r)' that 'counsel(s) hesitation' is not the fact that Congress has chosen to afford some manner of relief in the particular case, but the fact that congressionally uninvited intrusion into military affairs by the judiciary is inappropriate.") and *Bush*, 462 U.S. at 388 ("The question is not what remedy the court should provide for a wrong that would otherwise go unredressed. It is whether an elaborate remedial system that has been constructed step by step, with careful attention to conflicting policy considerations, should be augmented by the creation of a new judicial remedy for the constitutional violation at issue.")

Defendants argue that the BOP's Administrative Remedy Program grievance procedures provide an alternate remedial structure sufficient to provide Plaintiff relief without the need for a *Bivens* remedy. (Defs.' MTD at 16 [ECF No. 63 at 27].) Specifically, they rely on 28 C.F.R. § 542.13-15, which provides that inmates must first attempt to informally resolve grievances with staff using a BP-8 form; if the issue remains unresolved they may submit a BP-9 form to the warden; if they wish to appeal an adverse decision by the warden they may submit an appeal to the Regional Director using a BP-10 form; and they may appeal an adverse decision from that level to the General Counsel using a BP-11 form. (*Id*.) However, unlike the access to courts and retaliation claims in *Vega* and *Luis Buenrostro* where alternative relief was available because administrative procedures provided a mechanism for addressing or reversing not only the adverse actions of the defendants but the harm allegedly suffered by the plaintiffs, Defendants here have not shown relief though the MCC's administrative grievance procedures was similarly available to Plaintiff. That is, it is not clear based on Plaintiff's allegations whether his need to be protected could have been accommodated. In other words, it is not clear on the record currently before the Court whether Plaintiff could have sought alternate relief pursuant to MCC or BOP procedures requesting immediate consideration for, or placement in, protective housing at the time he was interviewed during his initial classification or when he returned from the hospital. Plaintiff alleges he was assaulted "soon after being housed." (FAC ¶ 15.) Without record development as to how soon after housing Plaintiff was attacked or the circumstances surrounding his assault, there is no showing that the administrative procedures at MCC would have been *available* to review the housing decision in time to protect him. Neither have Defendants shown those procedures are available to address Plaintiff's injuries. *See Abbasi*, 137 S.Ct. at 1862 ("It is of central importance, too, is that this is not a case like *Bivens* or *Davis* in which 'it is damages or nothing.' Unlike the plaintiffs in those case, respondents do not challenge individual instances of discrimination or law enforcement overreach, which due to the very nature are difficult to address except by way of damages actions after the fact.") (citation omitted).

The failure of Defendants to present such information, which they likely could not do without converting their motion to dismiss into one for summary judgment, precludes a finding at this time that the administrative remedy system is an available alternative remedial structure which should not be augmented with a *Bivens* remedy.

Neither have Defendants shown that a suit for declaratory, injunctive or habeas relief constitute available alternative remedies. If there was an extremely short window of opportunity to seek injunctive relief to direct the MCC to place Plaintiff in protective custody, that is, if he was assaulted just hours after his intake interview, which is an undeveloped factual issue, it would appear that an action for declaratory or injunctive relief would not have been available to prevent the assault. *See Boule*, 998 F.3d at 392 ("Finally, injunctive relief is an inadequate remedy, for Boule is seeking damages for Agent Egbert's completed actions rather than protection against some future act.") Also, it is unclear whether and to what extent Plaintiff's claim challenges MCC policies. *See Malesko*, 534 U.S. at 74 ("[U]nlike the *Bivens* remedy, which [has] never [been] considered a proper vehicle for altering an entity's policy, injunctive relief has long been recognized as the proper means for preventing entities from acting unconstitutionally.") The record has not been developed regarding the exact timing of Plaintiff's assault, or whether and to what extent prison regulations or policies provided for protective custody and whether MCC policies will be challenged in this action, and if so whether MCC policies function in a manner which would have allowed for relief in an action for declaratory or injunctive relief with respect to the decision not to place Plaintiff in protective custody. In addition, Plaintiff indicates he was only in federal custody for a month, and there is no showing an action for declaratory or injunctive relief would not have been rendered moot upon his release prior to resolution of the merits of his claim. With respect to the open question of whether a writ of habeas corpus was available to Plaintiff to challenge the conditions of his confinement at MCC, again Defendants have not shown that given the potentially short window of opportunity habeas was an available alternative remedy. *See e.g. Reid*, 825 Fed.Appx. at 444 ("The government does not attempt to explain how Reid's injuries could be addressed

through habeas, . . . and equitable relief does nothing to cure the damage Reid already suffered."), citing *Abbasi*, 137 S.Ct. at 1865.

Accordingly, with respect to "the question whether any alternative, existing process for protecting the [Plaintiff's] interests amounts to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages," *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007), the record is not sufficiently developed on this motion to dismiss to answer that question at this time. Defendants have not shown that Plaintiff's FAC is subject to dismissal for failing to state a plausible claim for *Bivens* relief on this basis.

### iv) Workable cause of action

Finally, Defendants identify as a special factor the "serious difficulty of devising a workable cause of action." (Defs.' MTD at 18 [ECF No. 63 at 29], citing *Wilkie*, 551 U.S. at 555-56 (noting "difficulty in defining a workable cause of action" where the claim "fails to fit the [Court's] prior retaliation cases.").) They contend that attempting to create a judicial remedy here would involve the courts "in endless knotty issues" such as "what crimes place inmates at increased risk, what other factors place inmates at risk, what are the violent tendencies of the particular prison population at issue, what are the security measures meant to protect inmates, and what are the resource limitations of placing inmates in protective custody." (*Id.*, citing *Oliver v. Baca*, 913 F.3d 852, 858-59 (9th Cir. 2019) (affirming summary judgment against state pre-trial detainee required to sleep on floor during entire three and one-half day stay at county jail because no constitutional violation arose from temporary emergency conditions that threatened safety and security of the facility which delayed plaintiff's placement in permanent housing), citing *Bell*, 441 U.S. at 547 (noting that correctional officials "should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.").)

Again, because the record is not yet developed with respect to the details of Plaintiff's claim, that is, whether and to what extent measures were in place at MCC to

protect pre-trial detainees from other inmates, how Plaintiff came to be assaulted, or how other inmates discovered the nature of his arrest offense, *see Abbasi*, 137 S.Ct. at 1860 (noting that it is the broad range of conditions of confinement claims which increases "the risk of disruptive intrusion by the Judiciary into the functioning of other branches."), it remains to be seen what "knotty issues" might counsel against recognition of a *Bivens* damages remedy under the circumstances. Without further record development, in particular whether this case involves a challenge to detention policies at MCC, it is difficult to determine if Plaintiff's claim "fails to fit" the run-of-the-mill failure to protect claims federal courts have routinely addressed for decades. *See e.g. Farmer*, 511 U.S. at 833 (noting that "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners."), citing *Wilson*, 501 U.S. at 303 ("[T]he medical care a prisoner receives is just as much a 'condition' of his confinement as the food he is fed, the clothes he is issued, the temperature he is subjected to in his cell, and the protection he is afforded against other inmates."); *Bell*, 441 U.S. at 539 (holding that a condition of confinement of a federal pre-trial detainee amounts to unconstitutional punishment where it "is arbitrary or purposeless" or otherwise not reasonably related to a legitimate penological goal); *see also e.g. Reid*, 825 Fed.Appx. at 444 ("A claim for damages based on individualized mistreatment by rank-and-file federal officers is exactly what *Bivens* was meant to address."), citing *Lanuza*, 899 F.3d at 1029-32; *see also Malesko*, 534 U.S. at 70-71 (declining to extend *Bivens* liability where it would not advance *Bivens*' purpose).

As discussed below with respect to Defendants' claims of qualified immunity, Plaintiff alleges a typical violation of the federal constitutional right of a pre-trial detainee to be protected from harm at the hands of other inmates. As pleaded, a plausible inference can be drawn from the facts alleged in the FAC that Defendants "made an intentional decision with respect to the conditions under which" Plaintiff was housed, that those conditions placed him "at substantial risk of suffering serious harm," that the Defendants "did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved-

making the consequences of the defendant's conduct obvious," and caused Plaintiff's injuries "by not taking such measures." *Gordon v. County of Orange*, 888 F.3d 1118, 1125 (9th Cir. 2018)*; see e.g. Hahn v. Murphy*, 07cv1153-SVW (MAN), 2011 WL 9378180, at *14-15 (C.D. Cal. Sept. 23, 2011) (determination of risk of assault by other inmates turned on whether there was a substantial risk inmates would learn about the prisoner's conviction for child molestation); *see also Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.")

Although on summary judgment Defendants may be able to show that allowing Plaintiff's *Bivens* claim to proceed presents a serious difficulty in devising a workable cause of action, or even show Plaintiff cannot demonstrate based on the evidence presented that he is entitled to the relief he seeks (*see e.g.*, Defs.' MTD at 2, n.1 [ECF No. 63 at 13 n.1] (noting that Plaintiff indicated on his Intake Screening Form that there was no reason he could not be placed in general population)), they have not and cannot make those showings on a motion filed pursuant to Fed. R. Civ. P. 12(b)(6). *See Lee*, 250 F.3d at 688 ("As a general rule, a district court may not consider any material beyond the pleadings in the ruling on a Rule 12(b)(6) motion.")

### v) Conclusion

Dismissal on a motion to dismiss "can be based on the lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable theory." *Balistreri v. Pacifica Police Dept.*, 901 F.2d 696, 699 (9th Cir. 1988). Plaintiff has plausibly *alleged* a cognizable legal theory, *Bivens*. Although a court may determine on a motion to dismiss whether a plaintiff *can in fact* proceed under *Bivens* when that question is "antecedent" to the issue of qualified immunity, *Hernandez v. Mesa*, 582 U.S. ___, ___, 137 S.Ct. 2003, 2006 (2017) (per curiam), Plaintiff's FAC alleges constitutional violations based on events which took place in 2016. The clearly established federal law applicable to the qualified immunity determination is the law in place at the time of the alleged conduct. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam). Here, that was before *Abbasi* was decided

in 2017, and the application of the special factors test in *Abbasi* is not antecedent to the issue of qualified immunity.

In sum, there well may be special factors counseling hesitation before Plaintiff may be permitted to proceed with his claims which appear to require a modest extension of *Bivens*. Given the limitations inherent in Rule 12(b)(6) and considering the gravity of the allegations made in Plaintiff's FAC, however, the Court finds Defendants have not made that showing at this time. As with the motion to dismiss in *Abbasi*, which also involved application of the *Iqbal* standard, the determination whether it is appropriate to take the "significant step" of extending *Bivens* here requires further development of the record. *Abbasi*, 137 S.Ct. at 1856.

Therefore, the Court **DENIES** Defendant's Motion to Dismiss Plaintiff's individual capacity claims against both Rodriguez and Kelly on the ground that Plaintiff has failed to plausibly allege he is entitled to pursue a claim for money damages under *Bivens*. The denial is without prejudice to future development of the record necessary to engage in the special factors analysis *Abbasi* requires, and without prejudice to renewal by way of a properly supported motion for summary judgment.

### D. Qualified Immunity

Defendants argue they are entitled to qualified immunity even if a *Bivens* cause of action exists because: (1) a general threat to Plaintiff's safety as alleged in the FAC is insufficient to state a claim that they were deliberately indifferent to his safety, (2) the allegation Plaintiff suffered only mental and emotional injuries as a result of Defendant Kelly's failure to place him in protective custody after his return from the hospital is insufficient to allege a violation of a clearly established right; and (3) there is no clearly established precedent placing Defendants on notice they were required to honor a request for protective custody from a pre-trial detainee for the sole reason the detainee was charged with the type of sex offense with which Plaintiff was charged. (Defs.' MTD at 19-24 [ECF No. 63 at 30-35].)

/ / /

"Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001), quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). When presented with a qualified immunity defense, the central questions are whether: (1) the facts alleged, taken in the light most favorable to the plaintiff, demonstrate that a defendant's conduct violated a statutory or constitutional right; and (2) the right at issue was "clearly established" at the time it is alleged to have been violated. *Saucier v. Katz*, 533 U.S. 194, 201 (2001), *receded from by Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (holding that "while the sequence set forth [in *Saucier*] is often appropriate, it should no longer be regarded as mandatory.")

A right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Saucier*, 533 U.S. at 202. "[T]he clearly established right must be defined with specificity." *City of Escondido v. Emmons,* 586 U.S. ___, ___, 139 S.Ct. 500, 503 (2019). "Although 'this Court's caselaw does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question beyond debate.'" *Kinsela v. Hughes*, 584 U.S. ___, ___, 138 S.Ct. 1148, 1152 (2018), quoting *White v. Pauly*, 580 U.S. ___, ___, 137 S.Ct. 548, 551 (2017) (per curiam). Plaintiff "bears the burden of showing that the right at issue was clearly established." *Emmons v. City of Escondido*, 921 F.3d 1172, 1174 (9th Cir. 2019).

## 1. Plaintiff has alleged a constitutional violation

Defendants first argue that the facts alleged in the FAC, even taken in the light most favorable to Plaintiff, do not show their conduct violated a statutory or constitutional right. Plaintiff alleges the Defendants were deliberately indifferent to a serious risk to his health and safety when they ignored his requests for protective custody. (FAC ¶¶ 7, 36-39.) Prison officials have "a duty [under the Eighth Amendment] . . . to protect prisoners from violence at the hands of other prisoners." *Farmer*, 511 U.S. at 833; *see also id.* at 832 (prison officials must "take reasonable measure to guarantee the safety of inmates."), citing

*Hudson v. Palmer*, 468 U.S. 517, 526-27 (1984). And although *Farmer* involved a convicted prisoner, "pretrial detainees . . . possess greater constitutional rights than prisoners." *Stone v. City of San Francisco*, 968 F.2d 850, 857 n.10 (9th Cir. 1992), citing *Bell*, 441 U.S. at 535. For example, a pretrial detainee bringing an excessive force claim "must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley*, 576 U.S. at 396-97. Thus, the due process rights of a pre-trial detainee are violated when:

> (i) the defendant made an intentional decision with respect to the conditions under which the plaintiff was confined; (ii) those conditions put the plaintiff at substantial risk of suffering serious harm; (iii) the defendant did not take reasonable available measures to abate that risk, even though a reasonable official in the circumstances would have appreciated the high degree of risk involved-making the consequences of the defendant's conduct obvious; and (iv) by not taking such measures, the defendant caused the plaintiff's injuries.

*Gordon*, 888 F.3d at 1125; *see Castro*, 833 F.3d at 1071 ("[A] pretrial detainee who asserts a due process claim for failure to protect [must] prove more than negligence but less than subjective intent - something akin to reckless disregard.") Defendants acknowledge those standards would apply to a *Bivens* claim.[3] (Defs.' MTD at 21-22 [ECF No. 63 at 32-33].)

Defendants argue, however, that even if the facts alleged in the FAC are presumed true, they show only that Plaintiff "faced a general risk of harm based on the offense for which he was arrested," and not a specific threat or "substantial risk" from being placed in the general population. (*Id*. at 21-23 [ECF No. 63 at 32-34].) In other words, Defendants claim that even if they intentionally decided to deny Plaintiff's request for protective custody based on his arrest offense, he has not sufficiently alleged facts to plausibly show

---

[3] The Court observes that *Castro*, which clarified that an objective standard applies to pre-trial detainee failure to protect claims after *Kingsley*, was decided on August 15, 2016, just two days *after* Plaintiff arrived at MCC. As previously noted, the record has not been developed as to exactly when Plaintiff was injured. The Defendants' acknowledgement that *Castro* applies for purposes of their motion to dismiss has no effect on the Court's ruling, nor does it restrict Defendants from arguing otherwise on summary judgment.

a reasonable officer would have appreciated he faced a substantial risk of serious harm merely due to his arrest offense.

Plaintiff replies that he has alleged sufficient facts to plausibly demonstrate an objectively obvious danger in placing a person accused of the type of sex crime for which he was arrested in the general population at MCC because Defendant Rodriguez implied he was aware of the danger when he reviewed the charges during their intake interview and advised Plaintiff to lie to the other inmates about the nature of his arrest offense. (Pl.'s Opp'n to Defs.' Motion to Dismiss [hereinafter "Pl.'s Opp'n"] at 7-12 [ECF No. 65 at 7-12].) Plaintiff argues this shows Defendant "understood that lying to other inmates could possibly avert them from making the Plaintiff the subject of attack." (*Id.*) Defendant Rodriguez replies that those allegations are irrelevant because the applicable test here is an objective one and does not turn on his subjective belief. (Defs.' Reply at 3 [ECF No. 67 at 4].) He argues that even if he was aware of a generalized threat to Plaintiff's safety arising from the sexual nature of his arrest offense, that alone is not enough to state a failure to protect claim. (*Id.*) However, Plaintiff alleges in the FAC that during their classification interview Defendant Rodriguez acknowledged the need for protective custody and referred to the precise nature of Plaintiff's arrest offense by making comments like: "What a great guy" and "What an upstanding citizen." (FAC ¶ 9.) Plaintiff also contends Rodriguez went so far as to give him an emergency contact form for use "when something happens to you in prison," before he "chose to ignore Plaintiff's requests to be placed in protective custody" in violation of prison policy and federal law. (*Id.* ¶¶ 10-12.)

Defendants are correct that "vague and unsubstantiated" allegations of a risk of harm are generally insufficient to state a failure to protect claim. *Davis v. Scott*, 94 F.3d 444, 447 (9th Cir. 1996). "The standard does not require that the guard or official believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault. But on the other hand, he must have more than a mere suspicion that an attack will occur." *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986). The Court takes judicial notice of its own

docket in Plaintiff's criminal case which is referenced in Plaintiff's FAC, and thus permitted on a motion to dismiss. *Bias v. Moynihan*, 508 F.3d 1212, 1225 (9th Cir. 2007); *Van Buskirk*, 284 F.3d at 980. The details of Plaintiff's arrest offense are included in the criminal complaint filed in that case. (*See* Compl., ECF No. 1 in So.Dist.Ca. Case No. 16cr2020-MMA.) As the parties are familiar with those details the Court need not recite them here. But assuming the facts alleged in the FAC are true, specifically that Defendant Rodriguez was aware of the nature of those charges after discussing them with Plaintiff and they made the risk that Plaintiff would be assaulted by other inmates obvious, and that Defendant Kelly was aware that Plaintiff was returning from the hospital after suffering life-threatening injuries as a result of not being placed in protective custody which made the risk of further assault obvious, the Court finds that Plaintiff's allegations that Defendants twice ignored his requests for protective custody plausibly allege a federal constitutional violation. *See e.g. Farmer*, 511 U.S. at 842 (noting that "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."); *Berg*, 794 F.2d at 460-61 (allegation that guard ignored obvious risk to prisoner's safety and released him from protective custody who was then beaten and raped stated a prima facie cause of action under the Eighth and Fourteenth Amendments); *Foster v. Runnels*, 554 F.3d 807, 816 (9th Cir. 2009) (denying qualified immunity for prison guard who was on notice that clearly established federal law precluded ignoring obvious risk to inmate's health); *Farmer*, 511 U.S. at 834 ("Being violently assaulted in prison is simply not 'part of the penalty that criminal offenders pay for their offenses against society.'"), quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).

Accordingly, the Court finds the facts alleged by Plaintiff, when taken in the light most favorable to him, are sufficient to allege a violation of his constitutional right to be free from deliberate indifference to his health and safety. *See Saucier*, 533 U.S. at 201. The Court therefore **DENIES** Defendants' Motion to Dismiss the FAC on the basis they are entitled to qualified immunity because Plaintiff has failed to sufficiently allege a constitutional violation.

## 2. Clearly Established Law: Defendant Rodriguez

Defendant Rodriguez next seeks dismissal on qualified immunity grounds arguing there is no Supreme Court or Ninth Circuit precedent which clearly establishes he had a duty to protect Plaintiff simply based on the nature of his charged sex offense. (Defs.' MTD at 23 [ECF No. 63 at 34].)

"The relevant inquiry [with respect to the required degree of specificity of the clearly established federal law for qualified immunity] is whether existing precedent placed the conclusion that [Defendant] acted unreasonably in these circumstances 'beyond debate.'" *Mullenix v. Luna*, 577 U.S. 7, 13-14 (2015), quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011); *Kinsela*, 138 S.Ct. at 1152 ("This Court has repeatedly told courts . . . not to define clearly established law at a high level of generality.") Evidence that attacks on certain classes of inmates are "longstanding, pervasive, well-documented, or expressly noted by prison officials in the past" may be relevant to the risk element of a failure to protect claim. *Farmer*, 511 U.S. at 842-43.

As *Farmer* noted in 1994:

> a prison official [may not] escape liability for deliberate indifference by showing that, while he was aware of an obvious, substantial risk to inmate safety, he did not know that the complainant was especially likely to be assaulted by the specific prisoner who eventually committed the assault. . . . and it does not matter whether the risk comes from a single source or multiple sources, any more than it matters whether a prisoner faces an excessive risk of attack for reasons personal to him *or because all prisoners in his situation face such a risk*.

*Id*. at 843 (citation omitted) (emphasis added).

Plaintiff has plausibly alleged he was in such a situation at MCC due to his arrest offense. *See e.g. Hahn v. Murphy*, 07cv1153-SVW (MAN), 2011 WL 9378180, at *14-15 (C.D. Cal. Sept. 23, 2011) (determination whether risk of assault by other inmates to federal prisoner with child molestation conviction was obvious or merely general turned on whether there was a substantial risk other inmates would or did learn about the conviction though the prison law library), citing *Farmer*, 511 U.S. at 834; *see also e.g. Bush v. Baca*,

08cv1217-SJO (PJW), 2010 WL 4718512, at *5 (C.D. Cal. Sept. 3, 2010) (report and recommendation) (finding deputies liable for failure to protect absent a specific threat to a child molester because he "fits within a class of prisoners who the deputies know will be attacked if put in contact with prisoners from the general population and for which they have a duty to protect, even in the absence of a specific threat."), *adopted*, 2010 WL 471994 (Nov. 10, 2010). Moreover, the lack of a developed record at the motion to dismiss stage prevents a determination of whether it is beyond debate whether Defendant Rodriguez violated a clearly established right because "objective reasonableness turns on the 'facts and circumstances of each particular case,'" *Kingsley*, 576 U.S. at 397, quoting *Graham*, 490 U.S. at 396, and because the qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brousseau*, 543 U.S. at 198.

When qualified immunity is asserted on a Rule 12(b)(6) motion to dismiss, "dismissal is not appropriate unless [the Court] can determine, based on the complaint itself, that qualified immunity applies." *O'Brien v. Welty*, 818 F.3d 920, 936 (9th Cir. 2016). Pursuant to Fed. R. Civ. P. 12(b)(6), and accepting as true Plaintiff's allegation that Defendant Rodriguez was aware of an obvious risk to his safety, but lacking any factual development with respect to the obviousness of that risk at MCC or with respect to the reasonableness of Defendant's decision not to provide protective custody or take other reasonable available measures to abate the risk, and in light of clearly established law requiring protection of pre-trial detainees from obvious risks of harm, the Court finds Plaintiff has carried his "burden of showing that the right at issue was clearly established," *Emmons*, 921 F.3d at 1174, and that Defendant Rodriguez has failed to show his conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix*, 577 U.S. at 11; *see also Saucier*, 533 U.S. at 202 (a right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (noting that risk to inmate heath and safety may be "so obvious that

our own Eighth Amendment cases [such as *Farmer*] gave respondents fair warning that their conduct violated the Constitution."); *Keates v. Koile*, 883 F.3d 1228, 1235 (9th Cir. 2018) ("If the operative complaint 'contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right,' then" granting qualified immunity on a motion to dismiss is prohibited), quoting *Pelletier v. Fed. Home Loan Bank of San Francisco*, 968 F.2d 865, 872 (9th Cir. 1992).

Defendant Rodriguez' Rule 12(b)(6) Motion to Dismiss based on his entitlement to qualified immunity is **DENIED** without prejudice to its renewal on summary judgment.

### 3. Clearly Established Law: Defendant Kelly

Defendant Kelly claims she is entitled to qualified immunity because there is no clearly established Supreme Court or Ninth Circuit precedent which recognizes as sufficiently serious the mental and emotional injuries Plaintiff allegedly suffered for the approximately one month after he returned from the hospital and was re-housed by Defendant Kelly in the same dormitory and same bunk as before. (Defs.' MTD at 23-24 [ECF No. 63 at 34-35].) Plaintiff replies that Defendant Kelly was aware of his need for protective custody because she knew he had just returned from the hospital after being assaulted and nearly killed, that a reasonable person would have known of the dangers, and her decision "caused great mental and emotional distress." (Pl.'s Opp'n at 8-9 [ECF No. 65 at 8-9].) Defendant replies that because Plaintiff admits he did not suffer physical injury after returning from the hospital, she is entitled to qualified immunity for lack of a showing of physical harm arising from her actions. (Defs.' Reply at 3-4 [ECF No. 67 at 4-5].)

Inmates are generally barred from pursuing claims for mental and emotional injuries if they suffered no physical injury or only *de minimis* injuries. *Oliver v. Keller*, 289 F.3d 623, 626-29 (9th Cir. 2002), citing 42 U.S.C. § 1997e(e) ("No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act (as defined in section 2246 of Title 18).") However, as described above, Plaintiff has alleged he suffered serious, permanent, life-threatening

physical injuries. Even to the extent it is not appropriate to consider those earlier injuries with respect to Defendant Kelly, Plaintiff has alleged more than just mental and emotional injuries attributable to Kelly's decision to house him in general population rather than protective custody. The FAC alleges that as a result of Defendant Kelly's decision to ignore his request for protective custody and place him in the same dormitory and same bunk as before, he suffered "diarrhea, unbearable stomach pain, back pain, testicle pain, leg pain, fever, night terrors, confusion, restlessness, loss of ap[p]etite, weight loss and mental and emotional distress." (FAC ¶¶ 30, 33.) Because Defendants seek dismissal pursuant to Fed. R. Civ. P. 12(b)(6), and Plaintiff plausibly alleges serious physical and emotional injuries as a result of Defendant's purported acts and omissions, the Court need not further decide which if any of those physical injuries are sufficiently serious or were the direct result of Defendant Kelly's alleged deliberate indifference to an obvious risk to Plaintiff's health or safety. *See O'Brien*, 818 F.3d at 936 (when qualified immunity is asserted on a motion to dismiss, "dismissal is not appropriate unless we can determine, based on the complaint itself, that qualified immunity applies."); *see also Oliver*, 289 F.3d at 630 ("To the extent that appellant [pre-trial detainee] has actionable claims for compensatory, nominal or punitive damages - premised on violations of his Fourteenth Amendment rights, and not on any alleged mental or emotional injuries - we conclude the claims are not barred by 1997e(e).")

The Court finds Plaintiff has carried his "burden of showing that the right at issue was clearly established," *Emmons*, 921 F.3d at 1174, and that Defendant Kelly has failed to show her conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix*, 577 U.S. at 11; *Saucier*, 533 U.S. at 201 (a right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right."); *Keates*, 883 F.3d at 1235 ("If the operative complaint contains even one allegation of a harmful act that would constitute a violation of a clearly established constitutional right, then" granting qualified immunity on a motion to dismiss is prohibited) (internal quote marks omitted).

3:18-cv-0434-CAB-NLS

Defendant Kelly's Rule 12(b)(6) Motion to Dismiss based on an entitlement to qualified immunity is **DENIED** without prejudice to its renewal on summary judgment.

## VI. Conclusion and Order

Accordingly, the Court **GRANTS** in part and **DENIES** in part the Motion to Dismiss brought by Defendants Rodriguez and Kelly pursuant to pursuant to Fed. R. Civ. P. 12(b)(6) as set forth above. The claims against both Defendants in their official capacities are **DISMISSED** with prejudice. The Motion to Dismiss the claims against Defendants in their individual capacities and for qualified immunity is **DENIED** without prejudice to renewal on summary judgment.

Defendants shall file an answer as to the surviving claim of Plaintiff's complaint no later than **July 23, 2021**.

**IT IS SO ORDERED**.

Dated: July 6, 2021

_____
Hon. Cathy Ann Bencivengo
United States District Judge